**TOSHIBA CORPORATION and Toshiba America Information Systems, Inc., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, Defendant,**

and

**American Telephone and Telegraph Co., Defendant–Intervenor.**

No. 90–08–00441.

United States Court of International Trade.

July 31, 1991.

Mudge, Rose, Guthrie & Ferdon, Jeffrey S. Neeley and N. David Palmeter, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, A. David Lafer, Tina M. Stikas, Office of Chief Counsel for Import Administration, U.S. Dept. of Commerce, of counsel, Washington, D.C., for defendant.

Covington & Burling, Harvey M. Applebaum, O. Thomas Johnson, Jr., Sonya D. Winner and Susan L. Burke, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs, producers and importers of small business telephone systems from Japan ("Toshiba"), challenge a scope ruling by the United States Department of Commerce ("Commerce") issued on July 27, 1990. Doc. 21. Specifically, Toshiba contests the part of the ruling in which Commerce found that Toshiba's 6000 series and 6500 series telephone sets are not "dual-use subassemblies" and, therefore, fall within the scope of *Certain Small Business Telephone Systems and Subassemblies Thereof from Japan,* 54 Fed.Reg. 50,789 (December 11, 1989) (antidumping duty order). Toshiba argues that such telephones are not within the scope of the antidumping order and that Commerce's scope determination is not supported by substantial evidence on the record and is not in accordance with the antidumping law.

For the following reasons, the court finds that Commerce properly included the 6000 series and 6500 series telephone sets in the antidumping duty order. Plaintiffs' motion for judgment on the agency record is, therefore, denied and this action is dismissed.

## BACKGROUND

*I. The Less Than Fair Value Investigation and Determination*

On December 28, 1988, American Telephone and Telegraph Company ("AT & T"), together with Comdial Corporation, filed a petition with Commerce and the United States International Trade Commission requesting that these two agencies initiate an antidumping investigation with respect to imports of small business telephone systems and subassemblies thereof from Japan, Korea, and Taiwan. Public Record Document ("P.R.Doc.") 1. In its petition, AT & T defined the subject merchandise as "[t]elephone systems with intercom or internal calling capability and total nonblocking port capacities of between 2 and 256 ports, and discrete subassemblies *designed and dedicated for use in such systems.*" *Id.* at 7 (emphasis added). AT & T explained that a subassembly was "designed" or "dedicated" for use in a particular small business telephone system if it was designed or dedicated for use with the central elements of those systems. Further, AT & T stated, these subassemblies should be considered "dedicated" if they "function fully only when operated through the control unit of the system or systems for which they are designed." *Id.* at 8 n. 5.

Commerce proceeded to initiate antidumping investigations on imported small

business telephone systems and subassemblies from the countries named in the petition. In *Certain Small Business Telephone Systems and Subassemblies Thereof from Japan,* 54 Fed.Reg. 3,516 (January 24, 1989) (initiation of antidumping duty investigation), Commerce described the covered merchandise as "telephone systems whether complete or incomplete, assembled or unassembled, with intercom or internal calling capability and total non-blocking port capacities of between 2 and 256 ports, and discrete subassemblies thereof *designed and dedicated for use in such systems." Id.* at 3,517 (emphasis added).

Notice of the preliminary affirmative determination by Commerce was published on August 3, 1989. *See Certain Small Business Telephone Systems and Subassemblies Thereof from Japan,* 54 Fed.Reg. 31,-978 (August 3, 1989) (preliminary determination of sales at less than fair value). In that notice, Commerce noted that a number of ambiguities existed in the scope language. Accordingly, Commerce stated that the language describing the subject subassemblies would be "clarified" to read as follows:

> Certain small business telephone systems and subassemblies thereof are telephone systems, whether complete or incomplete, assembled or unassembled, with intercom or internal calling capability and total non-blocking port capacities of between 2 and 256 ports, and discrete subassemblies *designed for use in such systems.* A subassembly is "designed" for use in a small business telephone system if it functions to its full capability only when operated as part of a small business telephone system.

*Id.* at 31,979 (emphasis added). Commerce defined dual-use subassemblies as "subassemblies that function to their full capability when operated as part of a large business telephone system as well as a small

system." *Id.* at 31,980. Since dual-use subassemblies by definition were not, under Commerce's definition, "designed" for use in small business telephone systems, such assemblies were excluded from the scope of the investigation.

The final determination was published by Commerce on October 17, 1989. *See Certain Small Business Telephone Systems and Subassemblies Thereof from Japan,* 54 Fed.Reg. 42,541 (October 17, 1989) (final determination of sales at less than fair value). The imported products covered by the investigation were described by Commerce with language identical to that used in the preliminary determination.

The International Trade Commission ultimately issued its final affirmative injury determination and on December 11, 1989, Commerce published the antidumping duty order. *See Certain Small Business Telephone Systems and Subassemblies Thereof from Japan* (antidumping duty order), *supra.*

## II. The Ruling Concerning the Scope of the Antidumping Duty Order

After issuance of the antidumping duty order, Toshiba requested Commerce to clarify the scope of the order. P.R.Doc. 6. Toshiba asked for a formal determination that its Perception II and Perception ex systems were outside of the dumping order because these systems were large business telephone systems containing more than 256 non-blocking ports.[1] Toshiba also requested Commerce to determine that thirteen different telephone sets (labelled the "6000 series" and the "6500" series)[2] it manufactured "function[ed] to their full capability when operated as part of a large business telephone system as well as [when operated as part of] a small business telephone system, and therefore [were] outside the scope of the dumping order." *Id.* at 2.

---

1. Ultimately, Commerce ruled that the Perception systems were large business telephone systems and therefore, were excluded from the antidumping order. *See* P.R.Doc. 21 at 7. This portion of the scope determination is not at issue.

2. The 6000 series encompasses models EKT–6000–N, EKT 6000–NM, EKT 6015–H, EKT 6015–S, EKT 6025–H, EKT–6025–SD, EKT 6025–S and HDSS 6060. P.R.Doc. 6 at 2. The 6500 series refers to models EKT 6520–SD, EKT 6510–S, EKT 6510–H, EKT 6520–H and HDSS 6560. *Id.*

This second request—that Commerce determine that these two series are "dual use" subassemblies—is the subject of this action.

Along with its request for a scope ruling, Toshiba submitted an affidavit of Mr. Robert E. Krumland, a Supervisor of Systems Engineering at Toshiba America Information Systems. *Id.* at App. D. Mr. Krumland explained that he examined the telephone sets at issue in light of Commerce's definitions of "designed for use" and "dual use." He stated that the telephones at issue functioned to their full capacity in large business telephone systems as well as in small business telephone systems.

On January 31, 1990, Commerce began a scope investigation pursuant to 19 C.F.R. § 353.29(b). P.R.Doc. 7. On February 22, 1991, AT & T submitted a letter in which it argued that the telephone sets in question did not provide the same level of functionality when used with the Perception systems (the large business telephone systems) as they provided when used with the Strata line (the small business telephone systems). P.R.Doc. 8 at 3. AT & T supported their claim with an affidavit of Mr. Steven G. Miller, a Supervisor and Member of the Technical Staff in the Systems Engineering Department of AT & T Bell Laboratories. Mr. Miller found several features and one display function that were available in the small, but not in the large business telephone systems: First, the "off-hook call announce" feature was available in a Strata system when an optional attachment was used, but unavailable in a Perception system. Second, the telephone sets could provide background music through the station speaker when connected to a Strata system, but not when connected to a Perception system. Finally, three buttons that controlled the display functions on two of the telephone sets[3] were operational when used with at least the Strata DK series, but were inoperative when the sets were used with the Perception II.

On March 8, 1990, Toshiba responded to AT & T's comments. P.R.Doc. 10. Although it categorically stated that "the functions that the telephone is capable of performing are exactly the same, regardless of whether the telephone is attached to a small system or to a large system," *id.* at 3–4, Toshiba argued that the test of full functionality depends on the software available at the particular time. Along with the letter, Toshiba submitted two affidavits by Mr. Krumland in which he admitted the following features functioned with the Strata systems, but not the Perception systems:

1. the mode button on the 6020–SD and 6520–SD sets (*Id.* at App. A para. 8.);

2. background music (*Id.* at App. B para. 5)[4];

3. "I-called" LED flashing (*Id.* at App. B para. 6);

4. toll restriction override by system speed dial (*Id.* at App. B. para. 7);

5. toll restriction override control (*Id.*);

6. automatic busy redial (*Id.*); and

7. voice or tone signalling (*Id.*).

In another letter dated April 13, 1990, Toshiba argued that the off-hook call announce feature was provided by the circuit card and therefore, was covered by the circuit card portion of the dumping order, not the telephone set portion. P.R.Doc. 14 at 2. Toshiba further explained that it offered different software features for the Strata and Perception systems for marketing reasons.

Additional comments were filed by AT & T on April 19, 1990. P.R. Doc. 15. AT & T urged Commerce not to ignore all features and functions provided by circuit cards because this would exclude virtually all telephone sets on dual-use grounds. Instead, AT & T argued that Commerce should consider whether Toshiba's 6000 and 6500 series telephone sets come equipped either with circuits or connectors that are func-

---

3. The 6020–SD and 6520–SD models.

4. Mr. Krumland stated that for marketing reasons Toshiba decided not to offer background music played through the station speakers with the Perception systems.

tionless when the set is used with a Perception system. In short, AT & T urged Commerce to base its dual-use analysis on the state of the telephone set hardware, not on the state of the telephone set after software changes.

Commerce officials met with plaintiffs on May 18, 1990 and discussed the features of the subject telephone sets. P.R.Doc. 16. On May 21, 1990, Toshiba filed a letter in which it maintained that all of the feature differences may be explained either by the fact that they involve software in the central processing unit of the Perception system, which has nothing to do with the capabilities of the system, or by the fact that they involve circuit cards which are covered by the circuit card subassembly portion of the dumping order. P.R.Doc. 17 at 2. AT & T submitted a letter in response on May 31, 1990, in which it continued to argue that full capability should be defined with respect to the ability of the system in the sense of actual hardware, rather than the potential ability of the system in terms of software. P.R.Doc. 18 at 2–3.

On July 27, 1990, Commerce determined that the telephone sets in question did not qualify as dual-use subassemblies. P.R.Doc. 21 at 10. Commerce reasoned that since the antidumping order contained no exception for features that are offered in small systems and not in large systems as a result of the availability of software for that particular system, Toshiba's emphasis on potential software is misplaced. Commerce found that "[t]he fact is that the telephone sets in question are capable of providing certain features that are not presently functional when the telephones are used with the Perception systems. The telephone sets in question, therefore, are not 'dual-use' subassemblies...." *Id.* Accordingly, Commerce determined that Toshiba's 6000 and 6500 series telephone sets fell within the scope of the antidumping duty order.

## ANALYSIS

In their brief, plaintiffs challenge both the scope definition set forth in the anti-

dumping duty order and the application of the scope definition to the 6000 and 6500 series telephone sets. Although plaintiffs seem to request only review of the July 27, 1990 scope ruling, most of their arguments challenge the change in language between the initiation of the investigation stage and the preliminary determination stage. The court, therefore, will address the challenge to the underlying scope definition and then examine the telephone sets at issue to determine whether they were properly found to fall within the antidumping duty order.

### I. The Scope Definition

In AT & T's petition and the initiation of investigation, the merchandise subject to investigation was defined as "discrete subassemblies ... designed and dedicated for use in such [small business telephone] systems." *Supra* at 661–62. This language indicated that the only merchandise covered by the investigation were subassemblies that were specifically designed and dedicated for use in a particular small business telephone system. In its preliminary and final determinations, Commerce omitted the word "dedicated," and stated that for subassemblies to be considered "dual-use" they must "function to their full capability when operated as part of a large business telephone system as well as a small system." *See supra* at 662. Plaintiffs argue that Commerce arbitrarily and probably unintentionally changed the scope of the investigation without any notice or explanation to the parties. As such, plaintiffs contend, the antidumping duty order is contrary to law.

▮ As a procedural matter, the clarification of the language explaining the scope of the investigation was a part of the final determination and, as such, should have been challenged within thirty days of the publication of the antidumping duty order. *See* 19 U.S.C. § 1516a(a)(2)(A) (1988). Toshiba never challenged the language, instead it requested a scope determination on January 23, 1990, forty three days after publication of the antidumping duty order.

Plaintiffs' assertion that the significance of the omission of the word "dedicated"

was not "readily apparent" at the time of the preliminary investigation, Plaintiffs' Brief at 9, is without merit. The court notes that in its preliminary determination Commerce plainly stated: "We note that a number of ambiguities existed in the scope language previously published in the Notice of Initiation with regard to the definition of subassemblies. We therefore have clarified the language describing the subassemblies under investigation." 54 Fed. Reg. at 31,980. The court is unable to imagine how Commerce could have been more clear in calling attention to its scope language clarification. Furthermore, Toshiba did not develop the products at issue at some later date. It should have known which of its products could be affected.[5] Thus, plaintiffs' argument that they were not in a position to address the scope definition is unpersuasive. In the interests of administrative efficiency, any questions concerning Commerce's authority to refine a scope definition at a particular stage of the investigation should have been brought up at that time. Because plaintiffs were in a position to do so, but did not object in a timely manner to the scope language used by Commerce in its preliminary and final determinations, plaintiffs must accept that scope definition for purposes of this action.

■ Assuming *arguendo* that plaintiffs may raise this issue now, the court finds that Commerce's clarification of the language in the preliminary determination was an appropriate exercise of its discretion. A necessary corollary to the principle that Commerce has inherent authority to define the scope of an antidumping duty investigation is that Commerce has the authority "to redefine and clarify the parameters of its investigation." *NTN Bearing Corp. of America v. United States,* 14 CIT ——, ——, 747 F.Supp. 726, 731 (1990) (citations omitted). *See also Torrington Co. v. United States,* 14 CIT ——, 745 F.Supp.

718 (1990), *aff'd,* 938 F.2d 1276 (Fed.Cir. 1991).

In its petition AT & T stated its definition of "dedicated" as "subassemblies [that] ... *function fully* only when operated through the control unit of the system or systems for which they are designed." P.R.Doc. 1 at 8 n. 5 (emphasis added). This was the same principle which Commerce elucidated in its preliminary determination. In this case, the court finds that the word "dedicated" was eliminated, not to change the scope of the investigation, but to resolve any ambiguities that might have arisen during the early stages of the investigation. It was well within the discretion of Commerce to clarify the scope language by eliminating a word and adding an explanatory phrase as it did, in order to depict more clearly the scope of the investigation.

## II. The Scope Ruling

■ The crux of this case is whether substantial evidence supports Commerce's determination that plaintiffs' 6000 series and 6500 series telephone sets are not dual-use telephones. The court has jurisdiction over a challenge to a scope ruling pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) (1988).[6] For the reasons set forth in the following paragraphs, the court finds Commerce's application of the "full capability" requirement is supported by substantial evidence on the record.

As indicated, in reaching its determination, Commerce carefully reiterated the scope of the antidumping duty order by stating " '[a] subassembly is "designed" for use in a small business telephone system if it functions to its full capability only when operated as part of a small business telephone system.' " P.R.Doc. 21 at 6 (quoting 54 Fed.Reg. 50,789). Commerce noted that those subassemblies that func-

---

**5.** Of course Toshiba cannot anticipate an unreasonable application of the language to its products. This is a question which may be addressed now and is taken up in the second portion of this opinion.

**6.** *19 U.S.C. § 1516a(a)(2)(B)(vi) (1988)* provides that this court may review:

A determination by the administering authority as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order.

tion to their full capability when operated as part of a large business telephone system as well as a small business telephone system would be considered dual-use subassemblies, and therefore, excluded from the scope of the order. In particular, the issue was whether the 6000 series and the 6500 series function to their full capacity when operated as part of the Perception systems as well as when operated as part of the Strata systems. *Id.* at 10.

As indicated, in deciding that the subject telephone sets do not operate to their full capability when operated as part of a large business telephone system, Commerce rejected Toshiba's argument that the differences in the features offered are due to the software in the central processing unit of the Perception system and have nothing to do with the capabilities of the telephones or the systems. Commerce observed that the antidumping duty order contained "no exception for features that are offered in small systems and not in large systems as a result of the availability of software for the particular systems." *Id.* Commerce found it compelling that the telephone sets in question are capable of providing certain features when used with Strata systems, but not with the Perception systems.

Commerce supported its conclusion about the different features with two concrete examples of certain functions which are not operational in the Perception systems. First, Commerce noted that Toshiba acknowledged that its telephone sets contains a "mode" key that is not functional with the Perception systems. Second, Commerce observed that the "off-hook call announce" feature is available when the telephones are used with the Strata system if an optional circuit card is installed with the telephone. The Perception systems do not have this capacity. For these two specific reasons, Commerce determined that the subject series do not function to their full capability when used with a large business telephone system. Commerce provided

further support for its decision by noting that in Appendix B of Toshiba's March 8, 1990 submission, Toshiba described other features of the subject telephone sets that function when the telephones are used with the Strata system but do not function when they are used with the Perception systems. *See supra* at 663 (listing of all the admittedly different features).

The court finds that substantial evidence exists in the record for Commerce's conclusion that the 6000 series and the 6500 series are not dual-use telephone sets. Commerce concluded that the actual hardware of the subject telephone sets does not operate to its full capability when used with large telephone systems. The court observes that Commerce supported its conclusion with two concrete examples of inadequacies in the functionality of the sets when used in large business telephone systems. Plaintiffs have not offered evidence which would indicate to the court that these features do indeed have the same functionality in large business telephone systems. Like Commerce, the court refuses to delve into potentialities of future software developments. It is not unreasonable for Commerce to base its definition, and ultimately its decision, on the current market and the merchandise actually marketed. It is possible that the subject merchandise could at some point in time function fully in both small and large business telephone systems, however, at this time they are not true dual-use telephone sets.

Accordingly, the court finds Commerce properly applied its previous scope definition to the products at issue. The court, therefore, denies plaintiffs' motion for judgment on the agency record and dismisses this case.